Filed 11/8/13  San Pasqual Fiduciary Trust Co. v. Holt CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAN PASQUAL FIDUCIARY TRUST COMPANY, as Trustee, etc., | |
| Plaintiff and Respondent, | G047029 |
| v. | (Super. Ct. No. A239915) |
| CLUNIES A. HOLT et al., | O P I N I O N |
| Defendants and Appellants; | |
| DAVID M. DENHOLM, | |
| Defendant and Respondent. | |

Appeal from an order of the Superior Court of Orange County, Mary Fingal Schulte, Judge.  Affirmed.

Law Offices of William B. Hanley and William B. Hanley for Defendants and Appellants.

Poindexter & Doutré and Jeffrey A. Kent for Plaintiff and Respondent.

Hinojosa & Wallet, Jeffrey Forer and Shannon H. Burns for Defendant and Respondent.

* * *

This court has before it several appeals arising from a long drawn out dispute between the beneficiaries of a family trust formed in 1973. This appeal concerns a challenge to the probate court's order granting the interim trustee's petition for instructions about what conditions, if any, should be placed on the required distribution of one-half of the trust's principal to beneficiary David M. Denholm (Denholm), in light of the over $5 million civil judgment Denholm may owe the trust if he loses his appeal challenging that judgment. We affirm the probate court's order holding (1) Denholm had a vested interest in 50 percent of the trust assets, which will include the civil judgment entered in *Clunies A. Holt, et al. v. David M. Denholm, et al.* (Super. Ct. No. 06CC12290) (hereafter the Civil Action), and (2) the distribution of those assets must be made whenever the remittitur issues in the pending appeal of the Civil Action.

I

A. *Background Facts*

We incorporate by reference the summary of facts contained in our concurrently filed opinion *San Pasqual v. Clunies A. Holt et al.* (Nov. 8, 2013, G046003) [nonpub. opn.] (*San Pasqual I*). This unfortunate family saga centers on the interpretation of the David Scott Denholm and Clunies Manson Denholm Trust dated April 2, 1973 (the Trust). The two trustors died long ago: David Scott Denholm died in 1984, and Clunies Madison Denholm died in 2005. As explained in detail in our opinion *San Pasqual I,* the Trust's beneficiaries have been embroiled in contentious litigation for many years.

There are two sides to this ongoing battle. On one side is the Trustors' son, Denholm, who served as the trustee until his resignation in December 2007. He is also one of the Trust's beneficiaries. The Trust states Denholm was a 50 percent income

2

beneficiary until the fifth anniversary of his mother's death, which was October 7, 2010. After that date, Denholm was entitled to receive a distribution of one-half of the Trust's estate. The interim trustee postponed this distribution due to the judgment entered against Denholm in the Civil Action and in favor of the Trust.

On the other side of the dispute is the trustors' daughter, Clunies A. Holt, who has a vested right to income generated by one-half of the Trust's assets for her lifetime. Her three children, Clunies E. Holt, James Holt., Jr., and Cameron Holt Schmidt, are entitled to distribution of the remaining one-half of the Trust's estate upon their mother's death. Holt and her children will sometimes be collectively referred to in this opinion as the "Holt Beneficiaries."

B. *The Civil Action*

The following facts are taken from the trial court's statement of decision in the Civil Action. Clunies A. Holt and her daughter Clunies E. Holt (hereafter the Holts) sued Denholm on behalf of the Trust for: (1) breach of fiduciary duty (first and tenth causes of action); (2) constructive fraud (second cause of action); (3) aiding and abetting breach of fiduciary duty (third cause of action); (4) fraud by concealment (fifth cause of action); (5) elder abuse (sixth cause of action); and (6) conversion (seventh cause of action).

The Holts also sued six limited liability companies for aiding and abetting a breach of fiduciary duty (third cause of action). Calico HGC I, LLC, and Calico Properties, LLC, were sued for aiding and abetting breach of fiduciary duty (fourth cause of action) and for fraud by concealment (eighth cause of action). Calico Properties was also sued for fraud by concealment (fifth cause of action). The Holts sued 15 other companies for fraud by concealment (ninth cause of action).

After the Holts presented their case-in-chief at trial, all the defendants (except Denholm) requested dismissal. The court granted the motion as to Nicole Biel (formally appearing as Nicole Denholm), Timothy Harris, Denholm Harris & Company,

3

Waterpoint Development Companies, LLC, and HGC Irvine, LLC. The court reserved ruling on the motions made by the other defendants. Two months later, at the end of trial, the court found in favor of all the remaining defendants, leaving only Denholm in the action.

The court found in favor of Denholm and against the Holts on the third, fourth, fifth, and sixth causes of action. It dismissed the tenth cause of action. It found in favor of Holts, "on behalf of the Denholm Trust" and against Denholm on the first, second, and seventh causes of action (breach of fiduciary duty, constructive fraud, and conversion respectively).

In the statement of decision prepared in the Civil Action, the trial court discussed the terms of the Trust, providing for equal distribution of net income to Denholm and Holt for a period of five years, ending on October 7, 2010. The court noted the Trust provided Denholm with a one-half interest in the principal "outright free of trust," while Holt's one-half interest remained in the Trust for her lifetime. The court determined Holt was entitled to the net income from her one-half interest, but she had "no power of invasion of the Trust property in a manner antagonistic to the intent of the [s]ettlors to generally provide income to the beneficiaries for their support and care for life."

The court determined Denholm, as trustee, had absolute discretion to manage the Trust's assets, but could not use or deal with Trust's property for his own profit, or for any other purpose unconnected with the Trust in any manner without consent of the other beneficiaries. (Citing Prob. Code, § 16004, subd. (a), formerly Civ. Code, § 2229; *Coberly v. Superior Court* (1965) 231 Cal.App.2d 685, 688.)[1]

The court determined Denholm was "liable to the Trust because he engaged in self-dealing without [Clunies A. Holt's] consent . . . . Specifically, Denholm borrowed

---

[1] All further statutory references are to the Probate Code, unless otherwise indicated.

4

money from the Trust at interest rates and repayment terms he set without [Clunies A. Holt's] consent . . . . Further, he personally took an interest in and personally benefitted from investments of Trust assets without the consent of his co-beneficiary." The court determined the Trust vested Denholm with absolute discretion in the use of Trust's assets, but he was not free to neglect his fiduciary duty to the Trust through self-dealing without the consent of the beneficiaries. The court noted, "Certainly, Denholm did not have the discretion to bet all of the [Trust's] assets 'on red' as testified to by several witnesses. Nor does the Trust authorize the [t]rustee to neglect [the T]rust or abdicate its judgment."

The court concluded Denholm breached his fiduciary duty when he borrowed money from the Trust for his own benefit and without Clunies A. Holt's consent. It stated, "Since an inherent conflict arises when the [t]rustee acts as both debtor and creditor, such a loan constitutes a breach of the undivided loyalty which the [t]rustee owes to the [T]rust . . . ." The court stated there was no evidence Holt consented to Denholm borrowing money from the Trust or consented to his self-dealing.

As to the constructive fraud action, the court based its decision on evidence Denholm "breached his fiduciary duty of loyalty by borrowing money from the Trust and engaging in self-dealing transactions. Denholm obtained monies from the Trust for his own personal use and benefit and used [the] Trust for his own personal use and benefit. [¶] The legal basis for the [c]ourt's decision is that Denholm as [t]rustee of the Trust, was a fiduciary. [Citation.] Constructive fraud is a species of fraud applicable to a fiduciary. [Citation.] A breach of fiduciary duty constitutes constructive fraud."

As to the seventh cause of action for conversion, the court based its decision on the fact Denholm, as trustee, was "directed by the terms of the Trust to engage in specific actions" and it does not permit any self-dealing. The court determined "Denholm used the Trust's assets for his personal use and benefit, contrary to the purpose and terms of the Trust, and converted the Trust's money to and for his own benefit. Denholm commingled the Trust money in his personal bank accounts for extended

5

periods of time in order to sustain his business investments and expenses and to maintain his personal income and lifestyle. The proceeds of the loans by the Trust to Denholm and the financial benefit derived from the loan proceeds are products of the Trust." The court noted conversion is a "'strict liability tort.'" It explained, "'The foundation of the act rests neither in the knowledge nor the intent of the defendant. Instead, the tort consists in the breach of an absolute duty; the act of conversion itself is tortious. Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial. [Citations.]'"

Finally, the court concluded Denholm did not act reasonably or in good faith when he engaged in self-dealing, and consequently, the court would not relieve Denholm from liability under section 16440, subdivision (b). It awarded the Trust damages as follows: (1) $213,971 for underpaid interest resulting from loans to Denholm; (2) $25,824 damages from loans to third party entities; (3) over $1.4 million for disgorgement of profit and income belonging to the Trust from Denholm's investments in which he had an interest; (4) damages for the use of Trust assets in connection with Denholm's investments that did not make a profit ($1,406,743); and (5) over $1.7 million in damages from Denholm's investments in which he held an interest.

The court in the Civil Action also explained in its statement of decision why it rejected the other causes of action against Denholm and the other defendants. It reasoned the evidence presented did not establish any factual basis to support those claims. The court explained those causes of action were all based on allegations Denholm, the various entities, partners, and Denholm's ex-spouse, "engaged in a 'fraudulent scheme and plan to use [the Trust] and its assets for their own personal use, gain and profit and to the detriment of the Trust and its beneficiaries.' [The Holts] claim these defendants entered into this 'scheme' for the 'purpose of looting [the Trust is]

6

unsupported by the evidence." Specifically, the court found no evidence the defendants acted with the intent to induce reliance or with the intent to deceive or defraud.

The court determined the Holts' action for elder abuse (regarding Denholm's mother) was also unsupported by the evidence. It concluded Denholm's mother did not suffer any financial harm or loss due to her son's conduct. The court also denied the request for punitive damages against Denholm, stating, "Denholm did not commit any of the alleged acts with actual fraud, malice or oppression. The court finds that the commission of actual fraud requires the intent to deceive. [Citation.] In the instant case, the court finds [Denholm] did not harbor the intent to deceive during the commission of any of the acts alleged in this action." And finally the court deferred to the probate court on the issue of whether Denholm, as trustee, was entitled to have attorney fees paid from the Trust (the tenth cause of action).

The final judgment in the Civil Action, filed May 6, 2011, "awards compensatory damages only in favor of [the Holts], on behalf of the [T]rust, and against [Denholm], individually, in the sum of $5,416,315,77 . . . and costs of suit . . . [to be determined at a future date]." On July 12, 2011, the judgment was amended nunc pro tunc to account for prejudgment interest ($5,751,682,17).[2]

C. *The Ongoing Dispute Regarding Denholm's Accounting*

The Holts objected to Denholm's accounting, filed for the period of time he served as trustee. They filed a petition to expand the time period of the accounting and objected to a portion of the credits Denholm took as trustee, seeking to surcharge him over $2 million. These accounting matters have not yet been tried in the probate court.

---

[2] An appeal of the Civil Action judgment is currently pending before this court, in addition to related appeals concerning postjudgment attorney fee awards. We granted San Pasqual's motion to consider the appeals arising from the court's instructions immediately and separately from the Civil Action rulings.

7

*D. The Petitions For Instructions*

The Trust provided Denholm was to receive a distribution of his one-half interest in the Trust on October 7, 2010.  Before that distribution, San Pasqual filed a petition for instructions concerning distribution of the Trust's principal in view of the then pending Civil Action as well as the outstanding challenges to Denholm's accounting.

This initial petition, filed September 13, 2010, asked the court if there should be preconditions "imposed on principal distribution to [Denholm] in view of the ongoing litigation between [him and the Holts]."  San Pasqual informed the court that the Civil Action judgment was expected in a few weeks, and if Denholm was found to be liable to the Holts or the Trust, his one-half of "the Trust estate would be subject to significant, if not complete, offset."  San Pasqual asked if Denholm's distribution should be conditioned upon the following requirements:  (1) expiration of all appeal periods relating to the Civil Action and accounting disputes; (2) payment to the Trust or liquidation of the amounts Denholm may owe the Trust, so that an offset for such liabilities can be taken against the principal amounts distributed to him; and (3) payment to the Trust of any fees and costs Denholm may owe arising from the accounting dispute or the Civil Action.  San Pasqual requested instructions about which Trust assets should be used to make the distribution to Denholm because much of the Trust's value was tied up in leased real property.

On December 1, 2010, San Pasqual filed a supplemental petition (hereafter first supplemental petition), advising the court a minute order had been issued in the Civil Action awarding the Trust over $5 million in damages.  San Pasqual provided a list of the Trust's current assets, having a net equity of over $2.5 million.  San Pasqual noted the Holts did not agree with San Pasqual's position the Civil Action judgment was for the benefit of the Trust and all its beneficiaries.  San Pasqual stated the amount of the judgment award should be added as an asset of the Trust, increasing the net assets of the

8

Trust to $8,272,568. San Pasqual proposed distributing Denholm his one-half interest in the principal as a credit against the $5 million he owed the Trust.

San Pasqual noted there was also a federal tax lien in the amount of $317,945.37 against Denholm's property interests. San Pasqual did not believe the Trust's spendthrift clause would prevent the IRS from foreclosing its lien on Denholm's interest in the Trust. San Pasqual requested instructions about whether it must satisfy the lien before making any distribution to Denholm.

And finally, San Pasqual asked for instruction about making income payments to Denholm because his rights as an income beneficiary terminated on October 7, 2010. San Pasqual recognized Denholm would be entitled to interest on his one-half vested interest in the undistributed trust principal.

The Holts filed objections to both petitions. On October 3, 2011, the court held a trial and considered the testimony of witnesses, reviewed exhibits, and heard oral argument. The court took the matter under submission and filed a lengthy statement of decision.

In the statement of decision, the probate court stated San Pasqual's petition for instructions about how to distribute Denholm's one-half interest in the Trust appeared to be a simple request. It stated the petition, however, was complicated by the following facts: (1) it was filed before the judgment in the Civil Action, and that judgment is being appealed; and (2) there are still actions pending in the probate department regarding Denholm's accounting and $2 million in surcharges against Denholm.

The court summarized the Holts' objections to the petition as follows: "The Holts argue . . . that 'there is no plausible scenario' under which [Denholm] is entitled to anything." The probate court concluded it could not "make that finding" and prepared a lengthy statement of decision addressing over 16 arguments raised by the Holts, as well as, a few concerns raised by Denholm. The probate court ultimately concluded (1) 50 percent of the Trust's assets as of October 7, 2010, vested with

9

Denholm, and (2) those assets should be distributed to Denholm when the remittitur is filed in the appeal concerning the Civil Action.  Because the Holts do not challenge all the findings made in the 13-page statement of decision, we have limited our discussion of the statement of decision to the specific issues raised by the Holts on appeal.

II

*A.  The Civil Action Judgment Is Only in Favor of the Trust*

The Holts' first contention on appeal is "Denholm is not entitled to half of the judgment in the Civil Action."  Their argument is based on the premise Denholm's interest in the Trust was "fixed" as of October 7, 2010, and cannot include the judgment.  They also maintain Denholm cannot, as a matter of law, benefit from his own wrong.  "Denholm would be unjustly enriched by virtue of misconduct if he were entitled to one-half of the Civil Action:  'No one can take advantage of his own wrong' [citation], must trump any right Denholm had to receive one-half of the Trust on October 7, 2010."

The probate court rejected this argument for several reasons.  First, the probate court noted the civil court did not order Denholm to pay the civil judgment while that matter was pending on appeal.  Moreover, the Trust clearly provided the trustee must distribute Denholm's share.  The court concluded, "Nowhere in the Trust, case law, or statute is it required that [Denholm] pay his 'damages' to the Trust prior to receiving his distribution therefrom."  The Holts fail to provide us with any authority to the contrary.  We found no authority holding Denholm must pay compensatory damages to the Trust before receiving his vested share of the Trust.

The probate court also recognized the Holts were not framing the issue correctly:  "The issue of allocation of the civil judgment (which clearly belongs to the Trust) is a matter that concerns the internal affairs of the Trust, was clearly at issue in this trial, and the [c]ourt has determined it accordingly."  The probate court clarified that "*contrary* to what the Holts argue, the Civil Action did not determine any allocation of the civil judgment. . . . True, the *judgment* was against [Denholm] only, but it was not

10

allocated to favor only the Holts either.  The civil court ruled that judgment was found in favor of the 'plaintiffs [Holts] on behalf of the [T]rust . . . .' *It was a credit to the [T]rust not to the Holts*."  On appeal, the Holts do not explain why this reasoning was incorrect. We find no reason to disturb the probate court's determination the civil judgment became an asset of the Trust, payable to its beneficiaries.

The probate court accurately explained Denholm's entitlement, as the Trust's beneficiary, to the Trust's assets was not before the civil court and was not decided in the Civil Action.  The only issue concerning Denholm's entitlement as one of the Trust's beneficiaries was related to the financial elder abuse cause of action and the court found in his favor on that claim.  Consequently, the civil court "never considered the issue of a forfeiture of [Denholm's] share of the Trust under the Probate Code.  The allocation of Trust assets (which includes the civil judgment), is a matter that concerns the internal affairs of the Trust, is clearly at issue in this trial, and the court has disposed of it accordingly."

We conclude the probate court's assessment of the limited issue before it was correct.  Nothing in the Civil Action's judgment indicated Denholm forfeited his interests as a beneficiary.  The entire judgment was allocated in favor of the Trust, not the Holts individually, nor Denholm individually.  The only issue left for the probate court to decide was how the Trust assets should be allocated.

Consequently, we find the Holts have mischaracterized the issue on appeal as relating to whether Denholm should be awarded one-half of the $5 million judgment in the Civil Action.  The probate court had nothing to do with the determination or award of that judgment.  It simply determined that under the terms of the Trust, Denholm was entitled to one-half of the Trust's estate.  This is the only ruling we are reviewing in this appeal.  And for this reason, we deem irrelevant the Holts' discussion and analysis of case law regarding allocation of civil judgments, unclean hands, and civil actions against trustees.

11

*B. The Civil Judgment Is Considered a Trust Asset*

The parties are in agreement that the $5 million judgment is an asset of the Trust. This conclusion is amply supported by the record. As recited in the statement of decision in the Civil Action, the judgment was in favor of the Trust, not the Holts individually. The trustee must seek collection of the judgment as it is now one of the Trust's assets.

On appeal, the Holts maintain that because the Civil Action judgment was entered *after* Denholm's interest in the Trust vested on October 7, 2010, it was not an asset of the Trust at that time, and therefore, Denholm is not entitled to any of it. We note this argument is an interesting departure from one raised in *San Pasqual I*. There the Holts argued Denholm's Trust interests terminated on October 7, 2010, and because the trustee delayed distribution, Denholm lost the right to collect his inheritance. In this appeal, the Holts argue that when the Trust terminated in 2007, Denholm's financial interest was "fixed" as of that date. In any event, both contentions are wrong. Denholm's interest vested in one-half of the entire Trust estate as it existed on October 7, 2010, not a particular dollar value. One of the Trust's assets as of October 7, 2010, was the right to recover the $5 million Denholm had misappropriated. That the judgment on the claim was not entered until after October 7, 2010, is of no legal consequence. The judgment was simply the fruition of the right to recover the loss.

Citing to *Salvation Army v. Price* (1995) 36 Cal.App.4th 1619 (*Salvation Army*), the Holts argue Denholm's interests would not be determinable on the date of the delivery of the Trust's assets (or include the Civil Action judgment), but rather should be determined from the date the Trust instrument terminated as to him. The Holts have misconstrued the case. We conclude the *Salvation Army* case supports the probate court's conclusion that because Denholm's interest in one-half of the Trust vested, his share will be valued on the date of distribution. The amount of his share was not "fixed" on October 7, 2010.

12

In the *Salvation Army* case the trustor's will created two testamentary trusts, Trust A and Trust B, for the benefit of her husband for his life. (*Salvation Army, supra,* 36 Cal.App.4th at p. 1621.) Upon husband's death, the assets in Trust B were to be paid to five specified charities (including the Salvation Army) in amounts that totaled $240,000. (*Ibid.*) The will provided the residue, if any, was to be paid to the trustor's nephew's children, or to their issue (who included defendant). The trustor died in 1971 and was survived by her husband. When he died four years later, Trust B had assets valuing over $178,000, and included an interest in a parcel of land that was the subject of several lawsuits. (*Id.* at p. 1622.) The court directed the trustee to postpone administration of Trust B pending resolution of the lawsuits. (*Ibid.*)

After 18 years passed, the trustee advised the court the lawsuits had been concluded and Trust B's assets had increased in value to nearly $900,000. (*Salvation Army, supra,* 36 Cal.App.4th at p. 1622.) The trustee petitioned the court for instructions indicating the $900,000 should be paid to the five charities proportionately. Defendant opposed the petition, claiming the charities were entitled only to $240,000, plus interest from 1974. The trial court agreed with defendant, and the charities appealed. The appellate court decided the charities had acquired a vested interest in all of Trust B's assets, reversing the trial court's ruling the charities had acquired a vested interest in no more than $240,000. (*Id.* at pp. 1622-1625.)

The court in *Salvation Army* reasoned section 15407, subdivision (a), provides a trust terminates when the terms of the trust expire. The court explained, however, that "[s]ection 15410, subdivision (c), provides, in relevant part, that upon termination of a trust which terminates under its own terms, the trust property shall be distributed 'as provided in the trust instrument or in a manner directed by the court that conforms as nearly as possible to the intention of the settlor as expressed in the trust instrument.' [Citation.] [¶] 'When the objects of a trust have been fully performed the title of the trustee ceases and the legal as well as the equitable title vests in the beneficial

13

owner unless the intention of the creator clearly appears that the legal title should continue in the trustee.' [Citations.] Moreover, '[i]n the absence of any indication to the contrary a testator contemplates prompt distribution.' [Citation.] [¶] In this case Trust B's purpose was to provide [the trustor's husband] with income during his lifetime, and [the trustor's] clear and stated intent was that the Trust B assets were to be distributed upon [the trustor's husband's] death. The parties do not dispute the probate court's finding that Trust B terminated upon [the trustor's husband's] death on November 11, 1974. [¶] We conclude, as a matter of law, that upon [husband's] death, the trust terminated after having been fully performed, and the beneficiaries' rights vested. At the time of termination the Trust B assets had a value of approximately $178,000 and were insufficient to fully satisfy the $240,000 in specific pecuniary charitable bequests. Consequently, the specific charitable beneficiaries each received a vested beneficial share of the Trust B assets proportionate to their specific bequests. [The charities] are correct that because at the time the trust terminated and the beneficial interests vested there was no residue, the residuary beneficiaries' interests were extinguished. That actual physical distribution of the Trust B assets was postponed 20 years does not affect the earlier vesting of title upon the trust's termination. [Citation.] Consequently, the court erred in determining that [the charities] were entitled only to $240,000 plus interest thereon and that [defendant] and the other residuary beneficiaries were entitled to all remaining Trust B assets." (*Salvation Army, supra*, 36 Cal.App.4th at pp. 1624-1625.)

In other words, the court held the charities had a vested interest (in proportionate shares) to the entire trust's principal, valued now at $900,000. Their interest was not fixed at $178,000 when the trust terminated. During the 20-year delay in distribution, the trust estate could have decreased or increased in value. Each charity was simply entitled to its share of the trust, valued at the time of long awaited distribution.

For the reasons already set forth in *San Pasqual I,* we reiterate that when the Trust terminated on October 7, 2010, Denholm gained a beneficial interest in one-half

14

of the Trust's principal. In that opinion, we held the postponement of his distribution did not change the nature of this vested interest. Contrary to the Holts' contention, the *Salvation Army* case does not support the theory the dollar amount of Denholm's share of the Trust became fixed. Just as the charities in *Salvation Army* could collect the substantial sum of money that accumulated when distribution was delayed for 20 years, Denholm can collect money the Trust recovered while his distribution of the Trust was delayed. As stated above, the judgment did not represent a new asset, but rather the recovery of money wrongfully taken from the Trust.

As aptly stated in the probate court's statement of decision: "The [c]ourt has previously ruled [and this court has affirmed on appeal] that [Denholm] remains a beneficiary of the Trust until his share is completely distributed to him or otherwise disposed. [Denholm's] interest in the Trust is present, unconditional and vested . . . . The civil judgment arose from a civil complaint that was filed against [Denholm] while he was a beneficiary of the Trust (as he continues to be). Even though the civil judgment was entered after expiration of the [five-year] vesting period, [Denholm] is still entitled to his portion of the civil judgment as it has changed from a chose in action to an obligation by [Denholm] to the Trust."

## C. Forfeiture

Alternatively, the Holts suggest Denholm forfeited his right to a distribution under the terms of the Trust because a civil judgment was entered against him. They have no authority to support this contention. Nor do they have any authority to support the notion they are entitled to Denholm's vested one-half share of the Trust. As aptly stated by the probate court, "The Holts believe that the civil judgment against [Denholm] is a *de facto* forfeiture of his interest in the Trust. This is not true. The civil judgment, against [Denholm] individually, is for the benefit of the Trust. The Holts, as beneficiaries of one-half of the Trust brought the civil action on behalf of the Trust and the judgment was for the benefit of the Trust. Thus, the civil judgment became another

15

asset of the Trust, along with the Trust's interests in the Sawtelle property, [etc.,] . . . ." Moreover, the court noted, "Nothing in the Trust expressly allows for withholding [his] share." We agree there are no grounds to find Denholm forfeited his interest in the Trust.

The probate court provided a detailed explanation about why it rejected the Holts' claim Denholm forfeited his inheritance and their assertion Denholm cannot be allowed to profit from his own misconduct, bad faith, fraud, and deceit. Primarily, the court based its decision on the conclusion the Holts had misstated the basis for the judgment in the Civil Action. The probate court reasoned Denholm was found liable in tort, but "clearly exonerated of any fraud or deceit . . . . No punitive damages were awarded. $5.3 million, roughly, is the sum of compensatory damages, which were awarded to the *Trust*. . . . The [c]ivil [c]ourt found no intent to deceive or defraud. . . . Constructive fraud was based on the finding of breach of fiduciary duty. The same is true for the finding of conversion, which the [c]ivil [c]ourt notes is a strict liability tort, not requiring knowledge or intent. . . . [The Civil Action trial judge] found [Denholm] was not relieved of liability under . . . section 16440, [subdivision (b),] because he did not meet his burden of proof to show he acted reasonably and in good faith. *This is not the same as a finding of bad faith . . . .* This is not the same as saying [Denholm] <u>forfeits</u> *his share.* (Fns. omitted.)" We have carefully read the lengthy statement of decision issued in the Civil Action and reach the same conclusion. Contrary to the Holts' arguments, Denholm was exonerated of elder abuse, fraud, deceit, and bad faith.

We therefore also agree with the probate court's conclusion that because Denholm was not found liable for elder abuse, the forfeiture statute (§ 259) was inapplicable.[3] And there is no other legal basis or reason to hold Denholm forfeited his inheritance.

---

[3] Section 259, subdivision (c), provides a person found liable of elder abuse or to have acted in bad faith cannot "receive any property, damages, or costs that are awarded to the decedent's estate" resulting from an action arising out of the abuse.

16

To the contrary, as aptly noted by the probate court, the case *Estate of Frank Dito* (2011) 198 Cal.App.4th 791 (*Dito*), held a section 259 finding would not necessarily eliminate a beneficiary's entire inheritance. In the *Dito* case, the testator's grandson petitioned for a hearing about whether the testator's widow was exempted from receiving a share of the estate as an omitted spouse because of allegations she committed financial elder abuse. The court held the financial elder abuse allegations had no bearing on the determination of whether the widow is an omitted spouse under sections 21610 and 21611. Section 259, "does not necessarily disinherit an abuser entirely but rather restricts the abuser's right to benefit from his or her abusive conduct. [Citations.]" (*Dito, supra,* 198 Cal.App.4th at p. 803, fn. omitted.) The statute "restricts the value of the estate to which the abuser's percentage share is applied and prevents that person from benefiting from his or her own wrongful conduct." (*Id.* at p. 804.) The abusers are considered "to have predeceased the decedent only to the extent the person would have been entitled through a will, trust, or laws of intestacy to receive a distribution of the damages and costs the person is found to be liable to pay to the estate as a result of the abuse." (*Id.* at pp. 803-804, fn. omitted.)

The *Dito* court concluded the section 259 claim "does not affect or threaten the prior determination that [the widow] is a surviving omitted spouse under section 21610. [The widow] retains that status and is entitled to her share of the estate as specified in section 21610, although she is not allowed to share in any damages and costs she could be liable to pay to the estate as a result of the alleged elder abuse. It is conceivable that any damages and costs [the widow] might be liable to pay to the estate would exceed her share of the estate, resulting in a situation in which she pays more to the estate in damages and costs than she receives as an omitted spouse under section 21610. However, the mere fact that application of section 259 *might* reduce or even effectively eliminate [the widow's] inheritance does not mean that it concerns the

17

same primary right as a claim she is an omitted spouse with an entitlement to a share of the estate." (*Dito, supra,* 198 Cal.App.4th at p. 804.)

In the case before us, there is no evidence of elder abuse, bad faith, fraud, or deceit. The civil judgment awarded only compensatory damages. As explained in the *Dito* case, Denholm's primary right to his share of the Trust would not be exempt if the civil judgment exceeded his share of the Trust. And of course, it is too early to determine the amount of Denholm's share, if any, of the Trust.

In its statement of decision, the probate court calculated (and the Holts do not dispute) the civil damages likely do not exceed one-half of the Trust's estate. If Denholm's expected inheritance exceeds the $5.3 million judgment, there is no basis to hold the Holts are entitled to the entire civil judgment plus the windfall of the rest of Denholm's share of the Trust.

We find it very telling the Holts do not attempt to refute the probate court's interpretation of the limited nature of the civil judgment against Denholm, or the established case law regarding when forfeiture is appropriate. The Holts' failure to support their contention with meaningful legal analysis waives the issue on appeal. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)

D. *As Held in San Pasqual I—Denholm is a Trust Beneficiary*

In their objections to the petition, the Holts again argued Denholm was no longer a beneficiary. The probate court chastised the Holts for persisting with this argument despite the probate court's prior ruling rejecting it. The probate court reiterated Denholm remains a beneficiary until his share is completely distributed to him or otherwise disposed of. It reasoned, Denholm's interest is "present, unconditional and vested . . . [and] necessarily includes the civil judgment, the Sawtelle property, and the other [assets of the Trust]. The Sawtelle property has a value that is greater than the debt. The other assets of the Trust, including case and notes, all exceed 'zero.' Thus, the value of [Denholm's] interest in the Trust is greater than 'zero.'"

18

We affirmed the probate court's prior ruling in *San Pasqual I*, and we incorporate by reference our discussion and holding Denholm's interest in the Trust was not forfeited or otherwise extinguished by the Trustee's delay in distributing Denholm's vested interest in one-half of the Trust's principal. We caution the Holts that to raise this issue again would be deemed a frivolous act subject to sanctions.

E. *Surcharge*

The Holts maintain that if this court determines Denholm is entitled to one-half of the judgment, his interest should be surcharged by that amount. We need not decide this issue because it was not properly raised or decided by the probate court. In other words, we found no court order denying a request for surcharge for us to review.

The record shows that in response to Denholm's request that the Trust property be sold to help pay his debt, the probate court noted San Pasqual had a duty under section 16006 "to preserve [T]rust property and under section 16010 to enforce claims that are part of the [T]rust property. Such claims include the civil judgment, and any surcharges against [Denholm] in connection with the pending accounting. [San Pasqual] asserts the trustee's right to claim an offset, which is an equitable principle. [Citations.] *There has been no surcharge to date*."

Consequently, the Holts' assertions regarding the right to a surcharge are premature. The civil judgment is not final and a hearing challenging Denholm's accounting has not yet taken place. The trustee's petition and the court's statement of decision both reflect the understanding the amount of Denholm's inheritance will depend on how much money he owes the Trust. The probate court properly recognized it had "insufficient evidence to set a dollar amount."

We note the Holts do not dispute the probate court's determination regarding the timing of Denholm's distribution. The court determined Denholm's share of the "assets shall be made upon filing of the remittitur in the appeal of the Civil Action." We anticipate San Pasqual will file a petition when the remittitur has issued,

19

seeking instructions on the amount to be distributed. Issues regarding offsets and surcharges can properly be addressed at that time.

*F. Benefitting From One's Own Wrong*

The Holts repeatedly complain the probate court's ruling permits Denholm to benefit from his own wrongdoing. We disagree. Due to Denholm's breach of fiduciary duty, he is obligated to pay the Trust $5.3 million in compensatory damages. Denholm's distribution will take into account what he owes the Trust, and for this reason he will not benefit from his wrongdoing.

For example, if we assume for the sake of argument the value of the Trust without the Civil Action judgment is $9 million, the total value of the Trust will increase to approximately $14 million with the judgment added. Pursuant to the express Trust terms, Denholm and the Holt Beneficiaries have an interest in one-half of the Trust estate ($7 million each). We fail to see how Denholm benefits from his wrongdoing if he pays the judgment before receiving his distribution of the estate, or if his distribution is offset by what he owes the Trust. In either scenario, the judgment will force Denholm to remedy his wrongdoing. On the other hand, we find it would be highly inequitable to distribute to the Holt Beneficiaries half of the current value of the estate $4.5 million in addition to the entire $5 million judgment (giving them $9.5 million), or as they suggest, the entire estate ($9 million) plus the judgment for a total of $14 million. The latter calculations would mean Denholm would receive no inheritance, forfeiting millions (in addition to the civil judgment) to the Holt Beneficiaries for no apparent reason. This windfall puts the Holts in a better position than if they had never sued Denholm. If this had been a case involving elder abuse the outcome may have been different, and the court could have held Denholm forfeited some portion of his inheritance. But Denholm prevailed on the elder abuse claim, and we find no legal basis to hold Denholm's vested interest in the Trust was entirely forfeited due to mistakes he made while acting as trustee.

20

## III

The order is affirmed.  Respondents shall recover their costs on this appeal.


_____
O'LEARY, P. J.

WE CONCUR:


_____
BEDSWORTH, J.


_____
ARONSON, J.